NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
KEVIN J. BUTLER (Cal. Bar No. 329129)
Assistant United States Attorney
General Crimes Section
     1200 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-6495
     Facsimile:  (213) 894-0141
     E-mail:     kevin.butler2@usdoj.gov

Attorneys for Applicant
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| IN RE CELLULAR TELEPHONE | No. **2:20-MJ-00812** |
|---|---|
| | GOVERNMENT'S *EX PARTE* APPLICATION FOR A WARRANT AUTHORIZING THE DISCLOSURE OF GPS AND CELL-SITE INFORMATION; REQUEST TO SEAL; AFFIDAVIT OF DREW KALIES |
| | **(UNDER SEAL)** |

## I.   INTRODUCTION

The United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, hereby applies for a warrant requiring cellular telephone service provider(s) to furnish the Drug Enforcement Administration (the "Investigating Agency") with information relating to the following cellular telephones:

a.   619-751-5138, a cellular telephone issued by T-Mobile ("Carrier"), with no subscriber information and believed to be used by an unknown individual (the **"Subject Telephone Number 1"**); and

1     b.    408-428-2996, a cellular telephone issued by T-Mobile

2 ("Carrier"), subscribed to Jose Ozuna, 9090 Gardendell, Bellflower,

3 CA 90201, (the "**Subject Telephone  Number 2**," collectively the

4 "**Subject Telephones**").  The user of the phone has not been

5 identified.

6     Authorization is sought to obtain prospective cell-site

7 information, as well as the physical location of the **Subject**

8 **Telephones**, to include E-911 Phase II data and latitude and longitude

9 data gathered for the **Subject Telephones**, including Global

10 Positioning Satellite and/or network timing information, including

11 Sprint's Per Call Measurement Data, Verizon's Real Time Tool, AT&T's

12 Network Event Location System and T-Mobile's True Call data, and

13 including information from such programs as Nextel Mobile Locator,

14 Boost Mobile Loopt, Sprint/Nextel Findum Wireless, which will

15 establish the approximate location of the **Subject Telephones**, and

16 which information is acquired in the first instance by the Carrier

17 ("GPS information"), at such intervals and times as the government

18 may request, and the furnishing of all information, facilities, and

19 technical assistance necessary to accomplish said disclosure

20 unobtrusively, for a period of 45 days.

21     The application is made in connection with an investigation of

22 offenses committed by Ernesto MACIAS, the users of Subject Telephones

23 1 and 2, and others known and unknown (the "Target Subjects"),

24 specifically, violations of 21 U.S.C. § 841(a)(1) (possession with

25 intent to distribute controlled substances) and 21 U.S.C. § 846

26 (conspiracy and attempt to distribute controlled substances) (the

27 "Target Offenses"), and is based upon the attached agent affidavit.

28 There is probable cause to believe that federal crimes are being

2

1  committed and that the information likely to be received concerning

2  the approximate location of the **Subject Telephones**, currently within,

3  or being monitored or investigated within, the Central District of

4  California, will constitute or yield evidence of those crimes.

5          II.   CELL SITE AND GPS INFORMATION FROM THE CARRIER

6          The information sought by this application includes information

7  about the location (physical address) of the "cell-sites" linked to

8  the **Subject Telephones** at call origination (for outbound calling),

9  call termination (for incoming calls), and, if reasonably available,

10 during the progress of a call.  This information, which is acquired

11 in the first instance by the Carrier, includes any information, apart

12 from the content of any communication, that is reasonably available

13 to the Carrier and that is requested by the Investigating Agency,

14 concerning the cell-sites/sectors receiving and transmitting signals

15 to and from the **Subject Telephones** whether or not a call is in

16 progress.  This prospective information is sought based on 18 U.S.C.

17 § 2701 et seq. (the "Stored Communications Act").  The Stored

18 Communications Act provides:

19
20     A governmental entity may require a provider of electronic
       communication service...to disclose a record or other
21     information pertaining to a subscriber to or customer of
       such service (not including the contents of communications)
22     only[1] when the governmental entity --

23           (A)   obtains a warrant issued using the procedures
                   described in the Federal Rules of Criminal
24                 Procedure...by a court of competent
                   jurisdiction[.]

25

26  _____

27      [1] This section also provides other methods to compel disclosure,
    including via subpoena or court order.  However, the government in
    this case is proceeding under the highest threshold, that is,
28  obtaining a warrant as described in § 2703(c)(1)(A).

18 U.S.C. § 2703(c)(1); see also Carpenter v. United States, ___
S. Ct. ___, 2018 WL 3073916 (June 22, 2018) (holding that a warrant
is required to obtain seven or more days' worth of historical cell-
site information).[2]

Prospective cell-site information is also sought based on the
authority of 18 U.S.C. § 3121 et seq. (the "Pen Register Statute").[3]
The government therefore also complies with the provisions of that
statute, including by providing the required certification by the
attorney for the government at the end of this application.  Pursuant

---

[2] The definition of terms in the Stored Communications Act makes
clear that the "record or other information" that a court may order a
provider to disclose to the government under Section 2703(c)(1)(A)
includes both cell site and other location information.  First, the
Stored Communications Act expressly adopts the definition of
statutory terms set forth in 18 U.S.C. § 2510.  See 18 U.S.C. § 2711
("As used in this chapter. . . (1) the terms defined in section 2510
of this title have, respectively, the definitions given such terms in
that section").  Thus, the term "provider of electronic communication
service" used in Section 2703(c) covers cellular telephone service
providers, because 18 U.S.C. § 2510(15) defines "electronic
communications service" as "any service which provides to users
thereof the ability to send or receive wire or electronic
communications."  18 U.S.C. § 2510(15).  Further, cell site and other
location information is "a record or other information pertaining to
a subscriber to or customer of" an electronic communications service
– another term used in Section 2703(c) – because cellular telephone
service providers receive and store the information, if sometimes
only momentarily, before forwarding it to law enforcement officials.
See In Re: Application of the United States for an Order for
Prospective Cell Site Location Information on a Certain Cellular
Telephone, 460 F. Supp. 2d 448, 457-60 (S.D.N.Y. 2006).  Finally,
this Court is a "court of competent jurisdiction" because it is a
"district court of the United States (including a magistrate judge of
such a court)... that...has jurisdiction over the offense being
investigated."  18 U.S.C. § 2711(3)(A)(i).

[3] 18 U.S.C. § 3127(3) defines "pen register" as "a device or
process which records or decodes dialing, routing, addressing, or
signaling information transmitted by an instrument or facility from
which a wire or electronic communication is transmitted, provided,
however, that such information shall not include the contents of any
communication."  A "trap and trace" device is similarly defined for
any device or process which captures incoming data.  See 18 U.S.C.
§ 3127(4).

to the Pen Register Statute, upon an application made under 18 U.S.C. § 3122(a)(1) a court "shall enter an ex parte order authorizing the installation and use of a pen register or trap and trace device anywhere within the United States, if the court finds that the attorney for the Government has certified to the court that the information likely to be obtained by such installation and use is relevant to an ongoing criminal investigation."   18 U.S.C. § 3123(a)(1).[4]

Cellular telephone companies routinely create and maintain, in the regular course of their business, records of information concerning their customers' usage.   These records typically include for each communication a customer makes or receives (1) the date and time of the communication; (2) the telephone numbers involved; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication.   The records may also, but do not always, specify a particular sector of a cell tower used to transmit a communication. Cell-site information is useful to law enforcement because of the limited information it provides about the general location of a cell phone when a communication is made.

This application also seeks GPS information for the **Subject Telephones**, which is sought based on 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41.   As discussed above, data that

---

[4] While 47 U.S.C. § 1002, which is part of the Communications Assistance for Law Enforcement Act of 1994 ("CALEA"), would preclude seeking physical location information based on the Pen Register Statute alone, the Stored Communications Act provides the requisite additional authority for this Court to authorize the production by the Carrier of cell-site information to the government.

provides information about the location of a customer's phone falls within 18 U.S.C. § 2703(c)'s definition of "a record or other information pertaining to a subscriber to or customer of [an electronic communication service]." Thus, the United States may obtain a warrant requiring a cell phone company to disclose GPS information "using the procedures described in the Federal Rules of Criminal Procedure," that is, Federal Rule of Criminal Procedure 41, as is contemplated by this application and order.

Some, but not all, cellular telephone service providers have the technical means to obtain GPS information. GPS information is not generated specifically for law enforcement, but is the product of United States Federal Communications Commission requirements that cellular telephone service providers maintain and access location information for emergency responders. To obtain GPS information, a "ping" (electronic signal) is sent to the cellular telephone, which unobtrusively activates the GPS chip in the telephone. This information is not provided in a streaming fashion regardless of the cellular telephone activity, but instead is sent only in response to specific law-enforcement agency requests. Location data through GPS information can be delivered as accurately as within three meters; however, if the cellular telephone is in motion, such as while in a moving vehicle, the error range in meters may be greater, or the cellular telephone service provider may simply provide cell-site information. In addition, the cellular telephone must be powered on and, usually, not in the middle of a telephone call, for GPS information to be obtained. Moreover, if the cellular telephone is inside a building, or is in some other way blocked from the satellite, GPS information may not be obtainable. In such cases, the

1  service provider will often provide law enforcement with cell-site
2  information instead.

3  ## III. OTHER REQUESTED ORDERS

4  Additionally, This application also seeks authorization under 18
5  U.S.C. § 3103a(b), for reasonable cause shown, to delay any
6  notification the government is required to give regarding the
7  requested warrant to the subscriber(s) and user(s) of the **Subject**
8  **Telephones** for a period of 30 days from the date that the disclosure
9  ends.  18 U.S.C. § 3103a(b) states that any notice required following
10 the issuance of a warrant may be delayed if, inter alia, the court
11 finds reasonable cause to believe that providing immediate
12 notification of the execution of the warrant may have an adverse
13 result.  An adverse result is defined in 18 U.S.C. § 2705(a)(2) to
14 include endangering the life or physical safety of a person, flight
15 from prosecution, destruction of or tampering with evidence,
16 intimidation of potential witnesses, or otherwise seriously
17 jeopardizing an investigation or unduly delaying a trial.  Moreover,
18 the Advisory Committee Notes for Fed. R. Crim. P. 41(f)(3) (2006
19 Amendments) state that delay of notice may be appropriate where "the
20 officer establishes that the investigation is ongoing and that
21 disclosure of the warrant will compromise that investigation."  The
22 attached agent affidavit provides reasonable cause to believe that
23 immediate notification of the execution of the warrant may have an
24 adverse result.  The proposed warrant both provides for the giving of
25 such notice within 30 days after the date that the disclosure ends
26 and prohibits, as part of the receipt of the requested information,
27 the seizure of any tangible property or any other prohibited wire or
28 electronic information as stated in 18 U.S.C. § 3103a(b)(2).  As

discussed in the attached agent affidavit, immediate notification of this warrant to the user(s) of the **Subject Telephones** may have an adverse result.

Similarly, pursuant to 18 U.S.C. § 2705(b) and 18 U.S.C. § 3123(d)(2), this application requests that the Court enter an order commanding the Carrier not to notify any person, including the subscriber(s) of the **Subject Telephones**, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the Carrier complies with the warrant or such later date as may be set by the Court upon application for an extension by the United States, for the reasons outlined in the attached agent affidavit.

This application also seeks an order that: (1) authorizes the disclosure of the requested information whether the **Subject Telephones** is located within this District, outside of the District, or both, pursuant to 18 U.S.C. § 2703(c)(1)(A) and Rule 41(b), and, for good cause shown, at any time of the day or night pursuant to Rule of Criminal Procedure 41; (2) authorizes the disclosure of not only information with respect to the **Subject Telephones**, but also with respect to any changed telephone number(s) assigned to an instrument bearing the same ESN, IMSI, or IMEI (hereinafter "unique identifying number") as the **Subject Telephones**, or any changed unique identifying number subsequently assigned to the same telephone number as the **Subject Telephones**, or any additional changed telephone number(s) and/or unique identifying number, whether the changes occur consecutively or simultaneously, listed to the same wireless telephone account number as the **Subject Telephones** within the period

1   of disclosure authorized by the warrant; and (3) orders the

2   Investigating Agency to reimburse the applicable cellular telephone

3   service provider for its reasonable expenses directly incurred in

4   providing the requested information and any related technical

5   assistance.

6       Finally, this application requests that it, the proposed warrant

7   that has been concurrently lodged, and the return to the warrant be

8   sealed by the Court until such time as the Court directs otherwise.

9   Allowing disclosure to the public at large would likely jeopardize

10  the ongoing investigation for the reasons outlined in the attached

11  agent affidavit.

12  Dated: February 20, 2020          Respectfully submitted,

13                                    NICOLA T. HANNA

14                                    United States Attorney

15                                    BRANDON D. FOX
                                      Assistant United States Attorney
16                                    Chief, Criminal Division

17

18                                    KEVIN J. BUTLER
                                      Assistant United States Attorney
19
                                      Attorneys for Applicant
20                                    UNITED STATES OF AMERICA

21

22

23

24

25

26

27

28

## CERTIFICATION

In support of this application, and pursuant to 18 U.S.C. § 3122, I state that I, KEVIN J. BUTLER, am an "attorney for the Government" as defined in Rule 1(b)(1) of the Federal Rules of Criminal Procedure. I certify that the information likely to be obtained from the requested warrant is relevant to an ongoing criminal investigation being conducted by the Investigating Agency of the Target Subjects for violations of the Target Offenses.

I declare under penalty of perjury under the laws of the United States of America that the foregoing paragraph is true and correct.

February 20, 2020
_____
DATE

_____
KEVIN J. BUTLER
Assistant United States Attorney
General Crimes Section

1    AFFIDAVIT OF DREW KALIES

2    I, Drew Kalies being duly sworn, declare as follows:

3                    I.    INTRODUCTION

4    1.    I am a Special Agent ("SA") with Drug Enforcement

5    Administration ("DEA"), and have been so employed since June of 2004.

6    I attended the DEA Academy for approximately four months.  I am

7    currently assigned to the Los Angeles Field Division Office, Ventura

8    Resident Office.  While with the DEA, I received specialized training

9    concerning violations of the Controlled Substances Act, contained

10   within Title 21 of the United States Code.  Prior to employment with

11   the DEA, I was employed as a police officer with the New York City

12   Police Department ("NYPD") for approximately three years.  While with

13   the NYPD, I worked with experienced detectives and other law

14   enforcement officers, and discussed various investigative techniques

15   with them.

16   2.    I have also participated in drug-trafficking investigations

17   as the case agent.  I have debriefed defendants and witnesses who had

18   personal knowledge of major drug-trafficking organizations.

19   Additionally, I have participated in many aspects of drug

20   investigations including conducting physical surveillance, writing

21   and executing search warrants, and conducting arrests.  Based on my

22   training and experience, I am familiar with drug traffickers' methods

23   of operation including the distribution, storage, and transportation

24   of drugs and the collection of money proceeds from drug trafficking.

25   I am also familiar with methods employed by large drug-trafficking

26   organizations to thwart detection by law enforcement, including the

27   use of cellular telephone technology, counter surveillance, false or

28   fictitious identities and encoded communications.

1    3.   I have also conducted several investigations into the

2 unlawful importation, possession with intent to distribute, and

3 distribution of controlled substances, as well as the related

4 laundering of monetary instruments, the conducting of monetary

5 transactions involving the proceeds of specified unlawful activities

6 and conspiracies associated with criminal drug trafficking and money

7 laundering offenses.   To successfully conduct these investigations, I

8 have used a variety of investigative techniques and resources,

9 including physical and electronic surveillance and various types of

10 informants and cooperating sources.   Through these investigations,

11 and my training and experience, I have become familiar with the

12 methods used by traffickers to smuggle and safeguard drugs, to

13 distribute drugs, and to collect and launder related proceeds.

14                    II.   PURPOSE OF AFFIDAVIT

15    4.   This affidavit is made in support of an application for a

16 warrant authorizing the disclosure of cell-site and GPS information

17 at such intervals and times as the government may request, and the

18 furnishing of all information, facilities, and technical assistance

19 necessary to accomplish said disclosure unobtrusively, which

20 disclosure will establish the approximate location of the following

21 cellular telephones for a period of 45 days: 619-751-5138, a cellular

22 telephone issued by T-Mobile ("Carrier"), with no subscriber

23 information and believed to be used by First Name Unknown, Last Name

24 Unknown (FNU LNU 1) (the **Subject Telephone 1**), and 408-428-2996, a

25 cellular telephone issued by T-Mobile ("Carrier"), subscribed to Jose

26 Ozuna, 9090 Gardendell, Bellflower, CA 90201 (the **Subject Telephone**

27 **2**") and used by FNU LNU 2.

28

1        5.    I also seek authorization under 18 U.S.C. § 3103a(b), for

2    reasonable cause shown below, to delay notification of the proposed

3    warrant for a period of 30 days from the date that the disclosure

4    ends.

5        6.    As described more fully below, I respectfully submit there

6    is probable cause to believe that cell-site information and GPS

7    information likely to be received concerning the approximate location

8    of the **Subject Telephone,** will constitute or yield evidence of

9    violations of 21 U.S.C. § 841(a)(1) (possession with intent to

10   distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and

11   attempt to distribute controlled substances) (the "Target Offenses"),

12   being committed by FNU LNU 1, FNU LNU 2 and others known and unknown

13   (the "Target Subjects").

14       7.    The facts set forth in this affidavit are based upon my

15   personal observations, my training and experience, and information

16   obtained from various law enforcement personnel and witnesses.  This

17   affidavit is intended to show merely that there is sufficient

18   probable cause for the requested warrant and does not purport to set

19   forth all of my knowledge of, or investigation into, this matter.

20   Unless specifically indicated otherwise, all conversations and

21   statements described in this affidavit are related in substance and

22   in part only.

23                 III. SUMMARY OF PROBABLE CAUSE

24       8.    Members of the DEA and the Ventura County Combined Agency

25   Team ("VCAT") have been investigating a drug-trafficking organization

26   responsible for the importation of methamphetamine, heroin, and

27   cocaine into the United States prior to its disbursement within the

28   greater Los Angeles area.  On November 12, 2019, approximately 24

3

1  pounds of methamphetamine were seized during a buy-bust operation.
2  Subsequent analysis of phones seized during the operation led
3  investigators to identify **SUBJECT TELEPHONE 1** and **SUBJECT TELEPHONE 2**
4  as phones believed to be involved in that transaction. The users of
5  these phones, FNU LNU 1 and FNU LNU 2, are believed to be active
6  members as organizers or the source of narcotics in the narcotics
7  trafficking organization.

8                 IV.   STATEMENT OF PROBABLE CAUSE

9      9.    Based on my own investigation in this case and my
10 discussions with members of the VCAT and other investigators, I know
11 the following:

12      A.    Investigation of Ernesto MACIAS

13     10.    Since August of 2019, the DEA, with the assistance of the
14 CS, has been investigating MACIAS for drug trafficking within Ventura
15 County.[1]  The CS informed law enforcement that while at El Tenampa
16 bar located at 1325 S. Oxnard Blvd, Oxnard, California, s/he was
17 informed by a third party that a multi-pound/kilo quantity narcotics
18 trafficker sells used vehicles in the vicinity of Skating Plus (1720
19 Mesa Verde Ave., Ventura, CA).  The CS stated s/he visited this
20 location and observed used vehicles with the telephone number of 805-
21 670-8634 listed as a contact number.  The CS stated that s/he met
22 with the user of this telephone, "Ernesto," who the CS described as
23 being a Mexican male, aged late-50, approximately 5'7" tall, short
24 black hair with brown eyes, mustache, diabetic and with a right foot

26     [1] The CS is being paid to assist law enforcement.  The CS has
convictions for at least the following crimes: possession and
27 transportation of a controlled substance, violating a court order to
prevent domestic violence, and driving under the influence.  The CS
28 has provided information in the past that has been corroborated and
led to the seizure of narcotics.

                                 4

injury, and drives a burgundy Chrysler 300 with chrome rims.   The CS
stated s/he met with MACIAS under the guise of discussing the
purchase of a used vehicle.   The CS stated s/he had previously seen
MACIAS at El Tenampa bar and that MACIAS fit the description given to
him by the third party (height, weight, diabetic with a right foot
injury).   The CS was shown an online photograph from the Ventura
County Star report concerning the arrest of MACIAS for narcotics
trafficking in March of 2019.   The CS identified the photograph as
that of the individual known to him/her as MACIAS.   This photograph
was later determined to be the booking photograph for MACIAS.

    11.   The CS stated that on September 7, 2019, during a meeting
unmonitored by law enforcement, s/he met with MACIAS in Oxnard, CA,
to discuss used vehicles that MACIAS was selling. The CS stated s/he
communicated with telephone number 805-670-8634, to arrange to meet
with MACIAS. The CS stated that soon after casual conversation, the
CS told MACIAS that the CS sold narcotics to customers out of the
area. The CS stated that MACIAS then volunteered to be a driver to
take drugs in and out of the state for the CS. The CS stated that
MACIAS stated that he (MACIAS) has a customer who is indebted to him
(MACIAS) and that the customer offered to pay off the debt by giving
MACIAS a kilogram of methamphetamine. The CS stated that MACIAS
offered to sell the CS the kilogram of methamphetamine if the CS was
interested. The CS stated s/he told MACIAS that if s/he looked at the
narcotics and like them, then the CS may purchase the methamphetamine
from MACIAS.   The CS stated that after the meeting, MACIAS texted the
CS photographs of additional cars he had for sale from a new phone
number (805-775-9997) and indicated the CS should contact him
(MACIAS) at this new number.

B.   CS and Ernesto MACIAS meet to discuss future purchase of methamphetamine.

12.   On September 20, 2019, surveillance was established by members of the DEA and Ventura County Combined Agency Team (VCAT) at Carl's Jr Restaurant, 1745 S Victoria Ave, Ventura, CA, in anticipation of a meeting between the CS and MACIAS to discuss a future narcotics transaction.

13.   Prior to the meeting SA Angelica Childs and I met with the CS at a neutral location where the CS and the CS's vehicle for contraband and large amounts of United States currency, with negative results.   The CS was then followed to the meet location.   During this time, the CS placed a monitored and recorded call to telephone number 805-775-9997 (MACIAS) to inform MACIAS of the meet location.

14.   At approximately 10:16 a.m., SA Michael Johnson observed a four door White Challenger bearing California license plate #8HTU190, park in the Carl's Jr. parking lot next to the driver's side of the CS's vehicle before MACIAS exited the White Challenger and entered the front passenger seat of the CS's vehicle.   Audio and video footage was taken during this meeting from within the CS's vehicle as well as video footage by surveillance.

15.   At approximately 10:33 a.m., the meeting ended before the CS departed the Carl's Jr. and followed SA Childs and I from the Carl's Jr parking lot to a neutral location where the CS and his/her vehicle were searched for contraband and large amounts of United States currency, with negative results.

16.   SA Childs and I debriefed the CS concerning the narcotics conversation.   The CS stated that s/he met with MACIAS by Carl's Jr.   The CS stated MACIAS arrived in a white Challenger as the sole

6

occupant and parked next to the CS's vehicle. The CS stated MACIAS
then entered the CS's vehicle as the front seat passenger. The CS
stated that during the meeting MACIAS and the CS discussed vehicles
that MACIAS had for sale before they began to discuss narcotics. The
CS stated s/he informed MACIAS that s/he was interested in obtaining
a new source for narcotics. The CS stated s/he and MACIAS discussed
the price the CS could pay MACIAS for a pound of methamphetamine and
the CS inquired about possibly obtaining heroin from MACIAS. The CS
stated MACIAS was interested in supplying the CS with narcotics and
would get back to the CS on Sunday. The CS stated that at the
conclusion of the meeting MACIAS exited the CS's vehicle and left in
the white Challenger.

      C.    <u>CS purchases from MACIAS approximately one pound of
           suspected methamphetamine on November 4, 2019.</u>

    17. Between November 1, 2019, and November 4, 2019, DEA agents
directed the CS to communicate with MACIAS over 805-775-9997.
Communications between the CS and MACIAS were monitored and preserved
by law enforcement.

    18. SA Gabriel Perez, a Spanish speaking agent familiar with
this investigation, reviewed the coded communications between the CS
and MACIAS and, in summary, came to the conclusion that:

        a. MACIAS agreed to sell one pound of methamphetamine to
the CS on November 4, 2019 for $1,600.

        b. MACIAS would receive $1,600 in payment for the one
pound of methamphetamine.

        c. MACIAS agreed to sell the one pound of methamphetamine
to the CS on November 4, 2019.

19. On November 4, 2019, at approximately 1:00 p.m., members of the DEA Ventura Resident Office along with members of the California National Guard Counter-Drug Task Force briefed in anticipation of a controlled purchase of one pound of methamphetamine from Ernesto MACIAS. Following the briefing, surveillance was established by DEA agents and task force officers in the parking lot of Harbor Freight Tools, 1425 S. Victoria Ave, Ventura, CA, the intended meet location between the CS and MACIAS.

20. At approximately 1:15 p.m., SA Michael Johnson and I met with the CS at a neutral location where the CS and the CS's vehicle were searched for narcotics or large amounts of money with negative results. I then provided the CS with $1,600 of official advance funds (OAF) and two digital audio and video recording devices for the interior of the vehicle and a body worn digital audio recording and transmitting device, before the CS was escorted to the parking lot of Harbor Freight Tools.

21. At approximately 2:07 p.m., I observed MACIAS arrive in the parking lot driving a silver Chrysler sedan bearing California plate #6NFB863. Minutes later, I observed MACIAS park in front of the CS's vehicle before he exited the silver Chrysler sedan and entered the front passenger seat of the CS's vehicle carrying a weighted paper bag underneath his left arm. I took digital video footage during this time. A few minutes later, I observed MACIAS exit the CS's vehicle empty-handed and left in the silver Chrysler sedan.

22. SA Johnson and I then witnessed the CS leave the parking lot to a neutral location where SA Johnson and I searched the CS and the CS's vehicle for large amounts of money or contraband with negative results. I also recovered the weighted paper bag from the

1  back seat of the CS's vehicle, which was found to contain a
2  crystalline substance in black plastic wrap wrapped in clear
3  cellophane within a brown McDonald's bag.  According to the DEA
4  Southwest Laboratory report, the substance tested positive for d-
5  Methamphetamine Hydrochloride with a net weight of approximately 443
6  grams (Approx. 0.977 pounds).  I also retrieved the recording devices
7  in the vehicle.

8      23.  SA Johnson and I then debriefed the CS was who stated that
9  s/he parked in the parking lot of Harbor Freight at the direction of
10  agents and, upon arriving, MACIAS called the CS and asked where they
11  would meet.  The CS stated s/he provided the location and a
12  description of his/her vehicle.  The CS stated that shortly
13  thereafter MACIAS arrived in a four door silver sedan and parked in
14  front of the CS.  The CS stated s/he signaled to MACIAS who then came
15  and entered the front passenger seat of the CS's vehicle with a
16  package under his arm.  The CS stated they then engaged in small talk
17  before the CS asked to see the pound of methamphetamine which was
18  contained in the package that had been carried under MACIAS's
19  arm.  The CS stated s/he then examined the package without opening it
20  before s/he placed it in the back passenger seat of the vehicle.  The
21  CS stated s/he then handed a cup containing $1,600 (of Official
22  Advance Funds) to MACIAS who took and counted the money.  The CS
23  stated MACIAS indicated he could provide additional narcotics to the
24  CS in the future.  The CS stated MACIAS then departed in the silver
25  sedan.

26      D.  Attempted Transaction on November 7, 2019.

27      24.  On November 7, 2019, members of the DEA and VCAT
28  established surveillance on MACIAS who indicated to the CS that he

9

1  was prepared to sell the CS approximately 18 pounds of

2  methamphetamine. Surveillance was ultimately terminated after MACIAS

3  failed to provide the narcotics and ceased to answer his telephone.

      E.   Arrests and Seizure of Approximately 24 Pounds of
            Methamphetamine on November 12, 2019.

    25. Between November 1, 2019, and November 12, 2019, DEA agents directed the CS to communicate with MACIAS. Call and text communications between the CS and MACIAS were monitored and preserved by law enforcement.

    26. SA Perez, a Spanish speaking agent familiar with this investigation, reviewed the coded communications between the CS and MACIAS and, in summary, came to the conclusion that:

      a. MACIAS agreed to sell approximately 20 pounds of methamphetamine to the CS for $1,600 on November 12, 2019.

    27. On November 12, 2019, at approximately 12:30 p.m., members of the DEA and VCAT briefed in anticipation of a controlled meeting between the CS and MACIAS where MACIAS would provide the CS with approximately 20 pounds of methamphetamine.

    28. At approximately 1:15 p.m., SA Perez and I, met with the CS at a neutral location where the CS and the CS's vehicle were searched for narcotics or large amounts of money with negative results. The CS was also provided with a digital recording device. The CS was also provided with a digital audio and video recording device within the vehicle which was never utilized during the subsequent meeting. SA Perez and I saw the CS escorted from the location to a parking lot on the north side of LA Fitness, 1760 S. Victoria Ave., Ventura, CA.

1    29.   At approximately 1:54 p.m., SA Perez and I observed Ernesto
2  MACIAS enter the parking lot in a white Lexus SUV bearing California
3  plate #4YXK450 and back into a parking spot near the CS's
4  vehicle.  The CS exited his/her vehicle and spoke to MACIAS through
5  the driver's window of the Lexus SUV before MACIAS departed the
6  parking lot in the white Lexus SUV.  I took digital video footage of
7  the meeting.

8    30.   The white Lexus SUV was briefly out of view before Ventura
9  County Combined Agency Team Det. Brandon Ordelheide observed MACIAS
10  driving through the parking lot of Ralphs, 1776 S. Victoria Ave.,
11  Ventura, CA, (an adjacent parking lot) before he parked within the
12  lot.  Det. Ordelheide then observed a silver Expedition bearing
13  California #6EYF167 (R/O: ALVARADO, Javier, 1300 Saratoga Ave., Unit
14  113, Ventura, CA), which was parked in the same lot, then move and
15  park next to the Lexus SUV.  Det. Ordelheide then observed a Hispanic
16  male in black pants and a grey shirt (later identified as Javier
17  ALVARADO) exit the silver Expedition and enter the front passenger
18  seat of the Lexus SUV.  After approximately thirty seconds, Det.
19  Ordelheide observed J. ALVARADO exit the front seat of the Lexus SUV
20  and enter the driver's seat of the silver Expedition.  Det.
21  Ordelheide then observed MACIAS exit the silver Lexus and enter the
22  silver Expedition's rear driver's side door.  Det. Ordelheide then
23  observed the vehicle depart the location before I observed it enter
24  the meet location parking lot.

25    31.   At approximately 2:08 p.m., SA Perez and I observed the
26  silver Expedition park in a stall to the south of the CS's vehicle
27  before MACIAS exited the rear driver's side door and walked to the
28  CS's vehicle while J. ALVARADO exited the front driver's seat of the

1   silver Expedition and stood by the door.  I observed MACIAS and the

2   CS meet near the CS's vehicle and walk together to the passenger side

3   of the silver Expedition and out of the view of

4   surveillance.  Shortly thereafter, the CS and MACIAS walked away from

5   the silver Expedition towards the CS's vehicle at which time MACIAS

6   entered the front passenger's seat and the CS walked towards the rear

7   of the CS's vehicle.  I took digital video footage of the meeting.

8       32.  At approximately 2:10 p.m., members of VCAT and DEA

9   converged on the location.  Det. Robert Davidson arrested J. ALVARADO

10   who, upon approach, was standing outside the driver's side door of

11   the silver Ford Expedition.  J. ALVARADO was arrested without

12   incident.  No identification was found on J. ALVARADO but he provided

13   his date of birth to Det. John Sunia as January 17, 1990.  Det. Sunia

14   arrested YEPEZ who upon approach was standing at the front passenger

15   side of the silver Expedition with a white iPhone telephone with

16   flowers on it to his ear (SUBJECT DEVICE 4).  YEPEZ ran approximately

17   10 feet before following the directions of Det. Sunia and was

18   arrested without incident.  Det. Sunia found expired identifications

19   in a wallet in YEPEZ's front right pocket.  YEPEZ provided his date

20   of birth to Det. Sunia as April 20, 1961.  Det. Pinkstaff arrested A.

21   ALVARADO who was on the driver's side in the third row seat of the

22   silver Ford Expedition.  Det. Pinkstaff escorted A. ALVARADO out of

23   the vehicle and placed him under arrest without incident.  Det.

24   Pinkstaff located a white phone (SUBJECT DEVICE 3) in the left front

25   pants pocket of A. ALVARDO.  No identification was found on A.

26   ALVARADO but he provided his date of birth to Det. Sunia as November

27   3, 1991.  Det. Matt Smith arrested MACIAS at the passenger side of

28   the CS's vehicle.

33.  SA Daniel McCormick searched the Ford Expedition and located a grey alcatel flip phone (SUBJECT DEVICE 1) and a grey/black iPhone in a black case (SUBJECT DEVICE 2) in the center console tray between the front seats, as witnessed by Patrick Hazelwood.  SA McCormick also located a cardboard box containing 11 packages of suspected methamphetamine and backpack containing five packages of suspected methamphetamine and a box from the third row seat containing two packages of a suspected methamphetamine, as witnessed by SA Hazelwood.

34.  SA McCormick also searched the white Lexus SUV and located a blue alcatel flip phone (SUBJECT DEVICE 5), a silver Motorola smart phone in a black/blue case (SUBJECT DEVICE 6) and a blue ZTE smartphone (SUBJECT DEVICE 7) located within the center console tray between the front seats of the vehicle, as witnessed by SA Hazelwood.

35.  J. ALVARADO, A. ALVARADO, YEPEZ and MACIAS were transported from the location by marked Ventura County Sheriff's Department vehicles and transported to the Ventura County Sheriff's Department headquarters for interviews.

36.  At approximately 3:10 p.m., following the meet, the CS was debriefed by SA Perez and I concerning the events which led to the arrests of J. ALVARADO, A. ALVARADO, YEPEZ and MACIAS.  The CS stated that s/he arrived at the meet location located to the north of LA Fitness on Victoria Ave.  The CS stated s/he called Ernesto (MACIAS) and indicated that s/he was ready to conduct the transaction and provided a vehicle description.  The CS stated MACIAS arrived a short time later in a Lexus SUV.  The CS stated s/he approached MACIAS and asked if MACIAS had the narcotics and MACIAS asked to see the money for the narcotics.  The CS stated MACIAS indicated that the

13

narcotics were nearby and the CS stated that s/he wanted to see and count the narcotics.  The CS stated MACIAS then departed.  The CS stated a few minutes later a silver Ford Expedition arrived.  The CS stated s/he signaled to the Ford Expedition before the vehicle parked and MACIAS exited.  The CS stated they (CS and MACIAS) both went to the rear passenger side door of the Ford Expedition.  The CS stated the male in the far back of the vehicle (known to be A. ALVARDO) then indicated that the narcotics were in the white box.  The CS stated s/he then counted nine packages of narcotics in the white box, at which time MACIAS indicated that the rest of the narcotics were in the black backpack.  The CS stated MACIAS then asked for the money for the narcotics.  The CS stated they (CS and MACIAS) then walked to the CS's vehicle at which time MACIAS went to sit in the passenger seat in anticipation of counting the money.  The CS stated law enforcement then conducted arrests of the involved individuals.

    F.   Post-arrest Statements Made Under Miranda Advisement.

    37.  Following their arrests, YEPEZ, A. ALVARADO, J. ALVARADO and MACIAS were transported to the Ventura County Sheriff's Department where they were advised of their Miranda rights and interviewed.  Additionally, SA Perez and I interviewed MACIAS at the scene of the arrest after advising him of his Miranda rights.

    38.  Based on my communications with SA Perez, a Spanish speaking agent familiar with this investigation, and my involvement in the interview with MACIAS, I learned the following:

        a.   MACIAS was present on November 12, 2019, to broker a one pound methamphetamine transaction with the CS.

        b.   MACIAS was unsure how much he would be paid for brokering the transaction.

1        c.    MACIAS stated YEPEZ was also brokering the narcotics

2   transaction.

3    39.   Based on my communications with SA Perez, a Spanish

4   speaking agent familiar with this investigation, and my involvement

5   in the interview with YEPEZ, I learned the following:

6        d.    YEPEZ was utilizing his wife's cellphone on November

7   12, 2019, which was the white cellphone with flowers on it (SUBJECT

8   DEVICE 4).

9        e.    YEPEZ denied knowledge of the narcotics transaction.

10   40.   Based on my communications with SA Perez, a Spanish

11   speaking agent familiar with this investigation, and my involvement

12   in the interview with A. ALVARADO, I learned the following:

13       a.    A. ALVARADO was present to accompany his brother A.

14   ALVARADO.

15       b.    A. ALVARADO suspected that he was present for a

16   narcotics transaction.

17   41.   J. ALVARADO provided only biographical information before

18   the interview was terminated.

19               **IDENTIFICATION OF SUBJECT TELEPHONE 1**

20   42.   On October 24, 2019, the Honorable Louise A. LaMothe, U.S.

21   Magistrate Judge, signed a search warrant for SUBJECT DEVICES 1 to 7.

22   I identified that SUBJECT DEVICE 2 was assigned telephone number 805-

23   793-7421.   I also determined that SUBJECT DEVICE 2 was utilized by J.

24   ALVARADO based on multiple photographs in the telephone of J.

25   ALVARADO as well as social media accounts in the names of "Javier

26   Alvarado," "Javier Alvardo" and "Javi23Alvrado."   I then reviewed

27   communications on and about November 12, 2019, the day of his arrest

28   and the seizure of approximately 24 pounds of methamphetamine.   I

discovered that on November 12, 2019, SUBJECT DEVICE 2 was in communication with multiple United States- and Mexico-based telephone numbers.   Specifically, I reviewed text communications between SUBJECT DEVICE 2 and telephone number 209-681-5657.   On November 12, 2019, at approximately 8:07 a.m., SUBJECT DEVICE 2 received a text message from 209-681-5657 which read "8507 pearblossm hwy littlrock ca 93513."   I know that 8507 Pearblossom Hwy., Littlerock, CA, is a McDonald's restaurant.   SA Gabriel Perez, a Spanish speaking agent, reviewed the subsequent texts between SUBJECT DEVICE 2 and 209-681-5657 and identified that the users of these devices were coordinating a meeting at this location for unspecified purposes.   Additionally, the user of SUBJECT DEVICE 2 (J. ALVARADO) stated his GPS indicated it would take about two hours for him to reach that location.   I know that this timeframe is consistent with driving from Ventura, CA, to Littlerock, CA.   I know that narcotics transactions are commonly conducted in public parking lots for the safety of the involved parties from each other and from law enforcement should law enforcement be monitoring and attempting to identify locations where narcotics are stored.   I issued a subpoena for telephone number 209-681-5657 and identified that the telephone was a prepaid telephone with no subscriber information and that the telephone was activated on November 4, 2019, and usage was terminated on approximately December 4, 2019.   I also know that narcotics traffickers will commonly utilize prepaid "burner" telephones with no subscriber information in an effort to evade the detection of law enforcement. These phones are used for short durations of time, thereby hindering law enforcement's efforts to identify and monitor the telephones. Based on my training, experience and knowledge of the investigation,

I believe that a meeting was coordinated between the user of 209-681-5657 and SUBJECT DEVICE 2 for the purpose of a narcotics transaction. I believe that during this meeting J. ALVARADO obtained some or all of the narcotics that were seized by law enforcement later that day. I believe the user of 209-681-5657 is involved in the distribution of narcotics. Use of this telephone has since been discontinued.

43. I reviewed toll records for 209-681-5657 between November 23, 2019, and December 4, 2019, and identified approximately ten communications with telephone number 619-751-5138 (**SUBJECT TELEPHONE 1**) on December 4, 2019. I know that the 619 area code is associated with the San Diego area near the border of Mexico. I know that narcotics couriers are often recruited from this area for the importation of narcotics from Mexico into the United States, as well as for the transportation of narcotics from the border to narcotics stash pads in surrounding areas. The narcotics are then stored at these stash pads in bulk prior to distribution. I know that communications with couriers is generally limited to the time period when narcotics are being delivered, which is consistent with the ten contacts which all occurred on December 4, 2019. I issued a subpoena for **SUBJECT TELEPHONE 1** and identified that there is no associated subscriber and the telephone was activated on approximately November 4, 2019. I reviewed toll records for **SUBJECT TELEPHONE 1** between November 24, 2019, and December 23, 2019, and identified approximately 25 contacts with telephone number 661-458-1438 which all occurred on December 26, 2019. On February 12, 2020, I spoke to SA Justin Carlson assigned to the DEA Los Angeles Field Division who informed me that he was investigating a large-scale narcotics trafficking organization involved in the importation of multi-pound

quantities of methamphetamine into the United States from Mexico.  SA

Carlson stated that during the course of his investigation he

identified the user of 661-458-1438 as a multi-pound distributor of

methamphetamine.  SA Carlson stated that on February 12, 2020, the

user of this telephone was arrested following the execution of a

search warrant in Palmdale, CA, where approximately 50 pounds of

methamphetamine were seized.

44.  I know **SUBJECT TELEPHONE 1** was in contact with 209-681-5657

who I believe coordinated a narcotics transaction on December 12,

2019.  I also know that **SUBJECT TELEPHONE 1** was in contact with 661-

458-1438 known to be used by a large-scale narcotics trafficker.  I

believe that the user of **SUBJECT TELEPHONE 1** is involved in the

trafficking of narcotics and **SUBJECT TELEPHONE 1** is used in

furtherance of these crimes.

## IDENTIFICATION OF SUBJECT TELEPHONE 2

45.  I reviewed communications over SUBJECT DEVICE 2, on and

about, November 12, 2019, the day of J. ALVARADO's arrest and seizure

of the approximately 24 pounds of methamphetamine.  From the call log

from SUBJECT DEVICE 2, I identified that between November 9, 2019 and

November 12, 2019, SUBJECT DEVICE 2 was in contact with 408-428-2996

(**SUBJECT TELEPHONE 2**) approximately 22 times.  On February 12, 2020,

I spoke to SA David Taban who informed me that **SUBJECT TELEPHONE 2**

was identified during a DEA San Diego Field Division investigation.

SA Taban stated the investigation involved a large-scale narcotics

trafficking organization which imported methamphetamine from Mexico

in vehicles equipped with hidden compartments prior to the

distribution of the narcotics, largely within the Los Angeles, CA,

area.  SA Taban stated that during the investigation **SUBJECT**

**TELEPHONE 2** was identified as a number in contact in approximately April/May of 2019 with a telephone utilized by Jose Jaime CAMBEROS-Grajeda.  SA Taban stated on May 2, 2019, CAMEROS-Grajeda was arrested, by the Anaheim Police Department for transportation of approximately 26.9 kilograms of methamphetamine.

46.  On February 13, 2019, I spoke to Federal Bureau of Investigations (FBI) Intelligence Analyst (IA) Vanessa Schnabel who is assigned to the San Diego Field Division. IA Schnabel informed me that the FBI is currently investigating high level members of the Sinaloa cartel in Mexico as well as domestic distributors for the organization.  These high level members of the Sinaloa cartel direct and oversea the importation of multi-pound quantities of cocaine, methamphetamine and fentanyl into the United States.  IA Schnabel stated that during their investigation they identified **SUBJECT TELEPHONE 2** as a number in contact with 562-390-9118, a domestic distributor for their organization based in the Los Angeles, CA, area.  IA Schnabel stated that **SUBJECT TELEPHONE 2** was in contact with the phone used by Erik RODRIGUEZ-Cuen in approximately May of 2019, prior to his arrest. IA Schnabel stated that on July 11, 2019, RODRIGUEZ-Cuen was arrested by the Los Angeles County Sherriff's Department while in possession of approximately 21 kilograms of fentanyl, 2.2 pounds of methamphetamine, 7 kilograms of cocaine, and 16 kilograms of heroin.

47.  I issued a subpoena for this number and identified that it is subscribed to Jose Ozuna at 9090 Gardendell, Bellflower, CA 90201 with an activation date of approximately march 25, 2019.  I have been unable to identify a "Jose Ozuna" associated with this address.

1    48.  I believe that based on the communications between SUBJECT

2    DEVICE 2 and **SUBJECT TELEPHONE 2** on and about November 12, 2019 (day

3    of approximately 24 pound methamphetamine seizure), and the other

4    known communications between SUBJECT TELEPHONE 2 and known narcotics

5    traffickers, that the user of **SUBJECT TELEPHONE 2** is involved in

6    narcotics trafficking and that **SUBJECT TELEPHONE 2** is used in

7    furtherance of these crimes.

8                    V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

9        49.  Based on my training and experience and familiarity with

10   investigations into drug trafficking conducted by other law

11   enforcement agents, I know the following:

12            a.   Drug trafficking is a business that involves numerous

13   co-conspirators, from lower-level dealers to higher-level suppliers,

14   as well as associates to process, package, and deliver the drugs and

15   launder the drug proceeds.  Drug traffickers often travel by car,

16   bus, train, or airplane, both domestically and to foreign countries,

17   in connection with their illegal activities in order to meet with co-

18   conspirators, conduct drug transactions, and transport drugs or drug

19   proceeds.

20            b.   Drug traffickers often maintain books, receipts,

21   notes, ledgers, bank records, and other records relating to the

22   manufacture, transportation, ordering, sale and distribution of

23   illegal drugs.  The aforementioned records are often maintained where

24   the drug trafficker has ready access to them, such as on their cell

25   phones and other digital devices.

26            c.   Communications between people buying and selling drugs

27   take place by telephone calls and messages, such as e-mail, text

28   messages, and social media messaging applications, sent to and from

                                    20

cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.   Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

50.   Based on my training and experience, I know that drug-trafficking organizations are continuing enterprises with the intent of making large quantities of money from the sale of illicit drugs. I believe that FNU LNU 1 and FNU LNU 2 are used in furtherance of further drug trafficking activities. I believe the GPS tracking of the **Subject Telephones** will assist investigators in identifying additional criminal associates, evidence locations, stash locations, and drug customers. Additionally, GPS tracking of the **Subject Telephones** will assist investigators in conducting surveillance by allowing investigators to remain out of the immediate view of the occupants of the vehicle who may be looking for the presence of law enforcement. The GPS tracking information from the **Subject**

1   **Telephones** will also assist investigators in locating the **Subject**
2   **Telephones** for the purposes of surveillance.

3       51.  I believe that the GPS tracking of the **Subject Telephone**
4   will identify crimes being committed in the Central District of
5   California.  I know that the seizure of the approximately 24 pounds
6   of methamphetamine occurred in Ventura, CA, and believe that these
7   numbers are associated with that seizure.  I know that **Subject**
8   **Telephone 2** is subscribed to an address in Los Angeles County.  I
9   know that **Subject Telephone 1** bears an area code associated with San
10  Diego.  I believe that the user of **Subject Telephone 2** is likely a
11  narcotics courier involved in the transport and distribution of
12  narcotics within the Central District of California.

13      52.  I seek GPS/cell-site information via this application
14  because this information will assist me in gathering evidence in the
15  ongoing investigation I have described above in the following ways:
16  (1) I am investigating a conspiracy, and determining concert of
17  action and contact between the conspirators is of value to my
18  investigation; (2) the information will allow me to identify members
19  of the conspiracy that I have not previously identified; (3) the
20  information will provide insight into the roles and actions of the
21  members of the conspiracy, and the criminal conduct committed by the
22  people being investigated; (4) it will provide information regarding
23  whether the individuals being investigated meet or have contact prior
24  to, or after, committing any criminal conduct; (5) it will more
25  readily provide information about any victims of the criminal
26  conduct; and (6) the information will often identify locations where
27  evidence is stored and where search warrants may be appropriate.
28  Moreover, it will assist in targeting surveillance conducted in this

1  case, and reduce the risk of being detected and revealing the nature
2  or fact of the investigation.  People who are involved in criminal
3  activity are often conscious of being followed and keep a close eye
4  out for surveillance units.  The chance of being discovered increases
5  with the more surveillance that is done and the closer the
6  surveillance units must get to the target subjects.  Use of the
7  prospective cell-site/GPS information enables the investigative team
8  to be more focused and judicious in its use of surveillance to those
9  times when it appears that events of significance are going to occur.
10 It also allows the investigative team the ability to conduct
11 surveillance at a greater distance, because the fear of losing the
12 target is reduced when surveillance is maintained via GPS/cell-site
13 information.  This will be especially useful in this investigation as
14 OCHOA was seen driving at high rates of speed during surveillance on
15 November 7, 2018, which made surveillance difficult to conduct
16 safely.  Additionally, the risk of surveillance being compromised is
17 greater when surveillance units are forced to maneuver quickly
18 through traffic mimicking the movement of the target vehicle.

19              VI.   GROUNDS FOR SEALING AND DELAYING NOTICE

20      53.  Based on my training and experience and my investigation of
21 this matter, I believe that reasonable cause exists to seal this
22 application and warrant, as well as the return to the warrant.  I
23 also believe that reasonable cause exists to delay the service of the
24 warrant by the Investigating Agency as normally required for a period
25 of 30 days beyond the end of the disclosure period pursuant to 18
26 U.S.C. § 3103a(b) and, pursuant to 18 U.S.C. § 2705(b), to enter an
27 order commanding the Carrier not to notify any person, including the
28 subscriber(s) of the **Subject Telephones**, of the existence of the

23

1  warrant until further order of the Court, until written notice is

2  provided by the United States Attorney's Office that nondisclosure is

3  no longer required, or until one year from the date the Carrier

4  complies with the warrant or such later date as may be set by the

5  Court upon application for an extension by the United States.   There

6  is reason to believe that such notification will result in:

7  (1) endangering the life or physical safety of an individual;

8  (2) flight from prosecution; (3) destruction of or tampering with

9  evidence; (4) intimidation of potential witnesses; or (5) otherwise

10 seriously jeopardizing the investigation.

11       54.   Furthermore, there is good cause for the warrant to be

12 issued such that the information may be provided to law enforcement

13 at any time of the day or night because in my training and

14 experience, and knowledge of this investigation, the subjects of the

15 investigation do not confine their activities to daylight hours, and

16 it is often even more difficult to conduct surveillance at night.

17

18

19

20

21

22

23

24

25

26

27

28

VII. CONCLUSION

55. For all of the above reasons, there is probable cause to believe that prospective cell-site information and GPS information likely to be received concerning the approximate location of the **Subject Telephones**, currently within, or being monitored or investigated within, the Central District of California, will constitute or yield evidence of violations of the Target Offenses being committed by the Target Subjects.

_____
Drew Kalies, Special Agent
Drug Enforcement
Administration

Subscribed to and sworn before me
this _____ day of February, 2020.

_____
UNITED STATES MAGISTRATE JUDGE